UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

REFUGIA G BARRERA, §
 §
     Plaintiff, §
 §
VS. § CIVIL ACTION NO. 2:17-CV-14
 §
CAROLYN W. COLVIN, §
 §
     Defendant. §

## MEMORANDUM AND RECOMMENDATION

Refugia G. Barrera filed a complaint seeking reversal of the decision of the defendant Commissioner of Social Security (Commissioner) for the purpose of receiving Disability Income Benefits (DIB). Plaintiff filed a brief in support of her application on June 15, 2017 and Defendant filed a response brief in support of the Commissioner's determination on July 5, 2017 (D.E. 8, 9, 10). For the reasons discussed below, it is respectfully recommended that the Commissioner's decision be vacated and Plaintiff's cause of action be remanded.

## BACKGROUND

Plaintiff filed an application for DIB on October 17, 2013, alleging an onset date of January 1, 2012 (Tr. 96; D.E. 6-4 at p. 2). The application was denied at all levels of the administrative process (Tr. 96-114, 4-9, 32-47; D.E. 6-4; D.E. 6-3 at pp. 5-10, 33-48). Plaintiff filed this civil action seeking reversal of the ALJ decision on January 12, 2017 (D.E. 1).

Plaintiff alleges that she has been unable to work since January 1, 2012 because of rheumatoid arthritis and other inflammatory arthropathies, discogenic and degenerative disorders of the back, and cardiovascular disorders (Tr. 96, 97; D.E. 6-4 at pp. 2, 3). Her reported symptoms include pain and swelling in her legs, pain in her knees, pain in her neck, dry eyes, impaired vision, severe headaches, and painful, swollen toes with bleeding toenails (Tr. 59-60, 69-73; D.E. 6-3 at pp. 60-61, 70-74). Prior to the onset of her disability, Plaintiff worked as bank teller, a cashier, and a substitute teacher (Tr. 60, 198; D.E. 6-3 at p. 61 and 6-7 at p. 6).

## MEDICAL EVIDENCE

In 2009 Plaintiff began to see Adriana Pop-Moody, M.D., a rheumatologist, for body aches and pains. In September 2009, X-rays of Plaintiff's pelvis, back, right wrist and right foot were normal, with the exception of mild osteoarthritic changes at the C5-C6 level with minimal narrowing of the neural foramina at the C5-C6 level bilaterally and a small right plantar calcaneal spur (Tr. 567-574; D.E. 6-12 at pp. 18-25). In June 2010 Plaintiff reported joint pain, swelling, and stiffness in her neck, upper back, shoulders, elbows, wrists, hands, feet, knees, and hips. She described the pain as sharp, throbbing, and constant and categorized it as moderate (tolerable but causing marked handicap) to severe. She also reported sicca syndrome, headaches, interstitial cystitis, fatigue, nausea, and bruising (Tr. 522; D.E. 6-11 at p. 74).

On examination Plaintiff had muscle tightness in her cervical spine and a full range of motion in her thoracic spine. Both shoulders had a normal range of motion, but with pain. Examination of her hips showed tenderness in the trochanteric bursa

bilaterally with decreased and painful range of motion. Plaintiff was diagnosed with unstable rheumatoid arthritis and unstable inflammatory polyarthropathy. She tested positive for ANA[1] and also was noted to have long-term use of high-risk medication. She was taking Methotrexate Sodium, Naprelan, and Prednisone (Tr. 523; D.E. 6-11 at p. 75). Plaintiff received a Toradol injection (Tr. 521; D.E. 6-11 at p. 73).

An X-ray of her cervical spine in August 2010 showed mild osteoarthritic changes at C5-C6 with no evidence of instability (Tr. 567; D.E. 6-12 at p. 18). Plaintiff reported improvement in her symptoms with the use of the Methotrexate. She still had constant joint pain, but described it as achy and tight (Tr. 520-521; D.E. 6-11 at pp. 72-73). She continued to see Dr. Pop-Moody for monthly follow-up exams. She was prescribed Remicade and Lortab in addition to her other medications (Tr. 511-520; D.E. 6-11 at pp. 63-72).

In February 2011 Plaintiff underwent a total abdominal hysterectomy in response to a diagnosis of chronic pelvic pain, menometrorrhagia, uterine fibroids, and dense abdominal and pelvic adhesions (Tr. 679; D.E. 6-14 at p. 11). In May 2011 Plaintiff saw Matthew Alexander, M.D., complaining of severe upper neck pain that radiated to the back of her head. She also had knee, ankle, hip, and shoulder pain. She also described the pain as mild and said it did not limit activities (Tr. 251-257; D.E. 6-8 at pp. 10-16).

---

[1] An antinuclear antibody (ANA) test measures the amount and pattern of antibodies in blood that work against a person's own body. An ANA test is used along with symptoms, physical examination, and other tests to diagnose autoimmune disease. http://www.webmd.com/arthritis/antinuclear-antibodies-ana#1 (last viewed on August 3, 2017).

An April 29, 2011 MRI of her spine showed minimal disc bulging at C3-4, C5-6, and C6-7 levels with the central canal intact. The foramina were normal except for mild bilateral C5-6 foraminal stenosis from small uncovertebral spurs. There was no evidence of significant central stenosis or cord edema. A CT scan of her cervical spine showed a broad-based central disc herniation causing mild central spinal stenosis in the left neuroforaminal narrowing. A lumbar CT scan showed diffuse degenerative changes with osteophylic growth most significant at C5-6 with no spinal stenosis or fractures noted. Dr. Alexander diagnosed Plaintiff with neck pain, cervical disc disease with myelopathy, cervical spinal stenosis, and lumbago. (Tr. 243-249, 259, 261: D.E. 6-8 at pp. 2-9, 18, 20).

Dr. Alexander prescribed physical therapy for Plaintiff in June 2011 and she attended five out of eighteen sessions. When she started therapy, she reported constant neck and back pain that she rated "ten" on a scale of one to ten. Tests showed compression and distraction of her cervical spine. She walked with stiffness and guarding and had reduced cervical strength (Tr. 264-266; D.E. 6-8 at pp. 23-25).

Plaintiff saw a cardiologist in May 2011 and reported periodic chest discomfort, shortness of breath, dizziness, and palpitations. Testing showed that she had an abnormal EKG. She was diagnosed with essential hypertension (benign). The cardiologist encouraged ambulation and physical activity (Tr. 276-292; D.E. 6-8 at pp. 35-51).

Dr. Pop-Moody continued to see Plaintiff regularly and treat her for unstable rheumatoid arthritis, polyneuropathy, fatigue, and malaise. Plaintiff also was diagnosed with unstable osteoarthritis in her right knee. She described constant burning and

tingling pain in her joints which was worse at night. Her pain was aggravated by a cold environment, weather changes, and exertion and was relieved by intra-articular steroid injections in her knees. She also was seeing an ophthalmologist for pain and inflammation in her eyes. In August 2011 Plaintiff was taking, in addition to her previous medications, Arava, Doxycycline, Hydrochlorothiazide, Metoprolol Tartrate, Neurontin, Pennsaid, and Vitamin D. Plaintiff described the pain as moderate and tolerable, but causing a marked handicap, especially because of her recent surgery. Plaintiff periodically received Toradol injections and Kenalog injections (Tr. 481-519; D.E. 6-11 at pp. 33-71).

Plaintiff saw a neurologist in August 2011, complaining of a tingling, stinging, stabbing sensation in her arms and legs. She was very sensitive to hot and cold temperatures and had diffuse itching. An EMG/nerve conduction study was essentially normal, although she had slightly reduced sensory nerve action potential on the right peroneal nerve. There was no evidence of lumbosacral radiculopathy, plexopathy, or myopathy. She was diagnosed with a mild sensory peripheral neuropathy and it was believed that her symptoms were exacerbated by fibromyalgia. She was prescribed Cymbalta and Gabapentin (Tr. 315-320; D.E. 6-9 at pp. 4-9).

In February 2012, Plaintiff reported that her pain, swelling, and stiffness were worsening since she was prescribed Remicade in June 2011. The Remicade would help, but only for about three weeks.[2] The pain was a constant, throbbing achiness and was

---

[2] Remicade, which is used to treat certain types of arthritis, is administered intravenously and generally patients receive infusions every eight weeks.

worse with walking.  She continued to receive Toradol and Kenalog injections (Tr. 478-482; D.E. 6-11 at pp 30-34).  In April 2012 X-rays of Plaintiff's ribs and thoracic spine were essentially normal.  (Tr. 562-563; D.E. 6-12 at pp. 13-14).

Plaintiff continued to see Dr. Pop-Moody on a bi-monthly basis and receive periodic Toradol and Kenalog injections.  In December 2012 Plaintiff complained of joint pain, swelling, and stiffness.  The pain in her neck was constant and responded only partially to pain medication.  She had numbness and tingling in her right arm and pain radiating from her cervical spine to the top of her head.  She could not stand long because of knee pain and using her hand was painful (Tr. 464; D.E. 6-11 at p. 16).  She had paraspinal tenderness in her cervical spine and limited range of motion in rotation to the left and right.  Diagnostic tests showed cervical distraction and Spurling's compression tests were positive.  She had painful and limited range of motion in her left shoulder and was unable to raise her right arm above her head.  Movement was painful in her right elbow and she had a deformity in the medial aspect.  She had eighteen out of eighteen positive tender points indicating fibromyalgia (Tr. 465; D.E. 6-11 at p. 17).  Fioricet was added to her medication regimen (Tr. 466; D.E. 6-11 at p. 18).

In January and February 2013 Plaintiff saw a pain management specialist.  Her chief complaint was cervical pain, which she described as sharp and feeling like an electric shock and was an "eight" on a scale of one to ten.  She had no weakness in her hand or arm.  The pain was worse with leaning, lifting, sitting, standing, and walking.

http://www.webmd.com/drugs/2/drug-16554/remicade-intravenous/details (last viewed August 3, 2017).

The doctor assessed her with cervical disc degeneration, cervicalgia, cervical spondylosis with myelopathy, and cervical spinal stenosis. Plaintiff received several cervical epidural steroid injections at C4-C5, C5-C6, and C6-C7. She also was prescribed Hydrocodone-acetaminophen (Tr. 321-331; D.E. 6-9 at pp. 10-20).

In July 2013 Plaintiff reported that her joint pain and stiffness were getting better, although she still described them as moderate and causing marked handicap. She had difficulties walking and using her hands. She also reported migraine headaches. She had decreased range of motion in both hips and knees. Her right ankle had soft tissue swelling and she had joint tenderness in her feet. She also reported shoulder and elbow pain, with a decreased range of motion in the left shoulder and medial epicondyle tenderness in the right elbow. The doctor discontinued Plaintiff's prednisone prescription and added a prescription for a Medrol (Pak). Plaintiff continued to receive periodic Kenalog injections to painful joints (Tr. 456-463; D.E. 6-11 at pp. 8-15). An X-ray of her right knee was normal (Tr. 561; D.E. 6-12 at p. 561).

In November 2013, Plaintiff reported that her symptoms were better since Actemra was added to her medication regimen, although she still had constant, dull pain in both shoulders, her right elbow, and right knee. Although range of motion was limited in the thoracic spine, she had normal strength and tone. She received additional Kenalog injections. At that time she was taking fifteen medications (Tr. 450-455; D.E. 6-11 at pp. 2-7).

In February 2014 Plaintiff reported that the pain in her neck, shoulders, and right elbow was dull but constant. She described the severity as mild but causing some

handicap. She also reported relief from Xeljanz but had missed four weeks of treatment because of insurance problems. The doctor discontinued six of her medications and added Norco (Tr. 576-578; D.E. 6-12 at pp. 27-29).

In April 2014 and November 2014 Plaintiff described the same symptoms previously reported, but in November she also had pain in shoulders, elbows, wrists, hands, fingers, hips, knees, ankles, and feet. Although Xeljanz gave her relief, she used it only sporadically because it was too expensive for her to afford to take regularly. Plaintiff received a Kenalog injection to her elbow in April (Tr. 637-644; D.E. 6-12 at pp. 88-95).

On August 29, 2014 Dr. Pop-Moody completed a questionnaire and wrote a letter stating that Plaintiff's rheumatoid arthritis caused her to have joint pain, swelling, stiffness, difficulty with range-of-motion, and joint deterioration. She had moderate to severe joint pain, swelling, and stiffness in her neck, lower back, shoulders, wrists, fingers, hips, and knees, with limited range of motion in her shoulders, hips, and knees. Plaintiff was unable to push, pull, or lift and unable to stand, walk, or sit in one position for more than thirty minutes without changing position or taking a break. Dr. Pop-Moody opined that Plaintiff could not perform fulltime competitive work (Tr. 596-603; D.E. 6-12 at pp. 47-54).

In March 2015 Dr. Pop-Moody noted that Plaintiff had subachromial tenderness in her right shoulder and a normal range of motion in both shoulders with pain. She had tenderness in both elbows and pain in her right elbow with deformities at the medial aspect. She also had tenderness in her fingers. She received Kenalog injections in her

knee and shoulder. Plaintiff was enrolled in a Xeljanz patient assistance project and the doctor's office would provide samples of the medication until she was approved (Tr. 638-639; D.E. 6-12 at pp. 89-90).

In June 2015 Plaintiff went to the emergency room with a second degree burn to her right arm and chest following the explosion of a pressure cooker. She also reported bilateral swelling of her legs for the past one-and-a-half months (Tr. 750, 754; D.E. 6-14 at pp. 82, 86). In September 2015 Plaintiff tripped and fell. X-rays of her right wrist, elbow, shoulder, and knee showed no acute fractures (Tr. 755-765 (Tr. 6-14 at pp. 87-97).

## HEARING TESTIMONY

Plaintiff, represented by counsel, attended a hearing on July 17, 2015. Plaintiff was forty-two years old, had three adult children, and lived with her cousin (Tr. 56-57; D.E. 6-3 at pp. 57-58). Plaintiff had graduated from high school and had last worked in March or April of 2014. She worked part time for a welding services company doing invoices. Her employer terminated her when work became slow. She applied for other jobs but they were all full-time and she did not think she could maintain a full-time job (Tr. 58-59; D.E. 6-3 at pp. 59-60).

Although she had work experience as a bank teller, she did not believe that she could return to that job because she could not stand up or sit on a stool long enough. When she worked at the bank she wore athletic shoes and special stockings, but her feet swelled and her toenails bled and came off. She had a great deal of pain in her legs. In addition, her rheumatoid arthritis caused her to have very dry eyes and impaired her vision, even when she used prescription eye drops (Tr. 59-60; D.E. 6-3 at pp. 60-61).

Plaintiff did not have any income but was living off a divorce settlement that she had received the previous December (Tr. 60-63; D.E. 6-3 at pp. 61-64). She paid for her medications out of pocket and could not afford all of them even with financial help from her daughter, mother, and cousin, so she did not take them all. She prioritized them by taking the ones that she would "d[ie] without." (Tr. 63; D.E. 6-3 at p. 64). During her ten-month marriage to her husband, which had ended the previous December, she was covered by his insurance (Tr. 64; D.E. 6-3 at p. 65).

She was first diagnosed with rheumatoid arthritis when she was 27 and had taken daily medication since that time. In June of the previous year Plaintiff had run out of Hydrochlorothiazide[3] and without it, she retains fluid, which causes pain and swelling. She called Dr. Pop-Moody's office but the nurse told her that they were no longer going to refill it and that she needed to see her regular doctor to have it prescribed. Without insurance, she could not afford the $125 office visit fee, so she did without the drug. Within two months she was extremely swollen from head to toe, was in extreme pain, and could not put on shoes or pants. She went to the emergency room, where they prescribed her a lower dosage of Hydrochlorothiazide and told her to see her regular doctor. She still did not have the means to see her regular doctor (Tr. 65-66; D.E. 6-3 at pp. 66-67).

---

[3] Hydrochlorothiazide is a diuretic used to treat high blood pressure and edema caused by heart failure, liver disease, or kidney disease. It can lessen symptoms such as shortness of breath and swelling in ankles or feet. http://www.webmd.com/drugs/2/drug-5310/hydrochlorothiazide-oral/details (last viewed August 7, 2017).

Plaintiff was trying to enroll in an indigent program where the cost of her medications would be covered (Tr. 63; D.E. 6-3 at p. 64). However, she initially went to the wrong county to enroll and then began to have very bad hip pain which caused her to stay in bed for three days. She had not yet gone to the correct county to apply for the program. She had not received treatment for her hip (Tr. 66; D.E. 6-3 at p. 67).

At the hearing, Plaintiff was taking Arava, Cymbalta, Fioricet, Gabapentin, and Metoprolol Tartrate. She used a pharmacy discount card to pay for them but even with the discount she could not afford to buy them all the time. She needed to buy Xeljanz to treat the rheumatoid arthritis but could not afford it and had not had it for three-and-a-half months. When she last went to the doctor she was prescribed a stronger pain medication but she could not afford it because it cost $200 and the discount card did not apply. She was taking five or six Ibuprofen at a time for pain. In turn, the pain caused her blood pressure to rise and she took medication for that (Tr. 67-69; D.E. 6-3 at pp. 68-70).

Plaintiff tried to take Remicade but it caused her to have extreme fatigue and hair loss. She had the infusions once a month but the relief did not last long and would be followed by a flare-up. When she had a flare-up her joints would swell and be very red and tender to the touch and she would barely be able to move (Tr. 83; D.E. 6-3 at p. 84). Her doctors also told her that she developed neuropathy as a side effect of the Remicade. The neuropathy makes her very sensitive to heat and cold. Her skin stings and burns and it feels like she has needles poking all over her hands and feet (Tr. 83-84; D.E. 84-85). She also has numbness in her feet, toes, and ankles. If her hands get cold they become numb (Tr. 84-85; D.E. 6-3 at pp. 85-86).

In addition to the rheumatoid arthritis causing Plaintiff great pain in her neck and back, she also had a bulging disc and a herniated disc.  She had knots in her neck and migraine headaches.  She had seen a pain management doctor who administered injections to her spine, neck, and shoulders (Tr. 70; D.E. 6-3 at p. 71).  Dr. Pop-Moody also gave Plaintiff injections for pain in her buttocks, which helped for a few weeks.  She also has received injections in her knees but pain returned to her right knee after a few days.  Her right knee swells badly and she cannot put much weight on it, but she has not been able to have an MRI because she cannot afford it (Tr. 71-72; D.E. 6-3 at pp. 72-73).

She believes that the rheumatoid arthritis causes the most pain in her neck.  She received injections to that area in 2012 and 2013.  She saw that doctor about four times and received four or five months of relief.  She could not afford to continue seeing him and also had a partial hysterectomy which kept her from going back (Tr. 74-75; D.E. 6-3 at pp. 75-76).  She also has received injections in right hand, right elbow, and big toes of both feet (Tr. 82; D.E. 6-3 at p. 83).

Pain from the rheumatoid arthritis travels from her neck to her head and causes terrible migraine headaches.  She becomes very sensitive to light and has to stay inside.  She uses Pennsaid drops on her neck and takes Fioricet.  She gets the migraines one or two times a month and they generally last an entire day.  In addition to migraines, she has other headaches that are painful but don't cause her to be light-sensitive (Tr. 86-87; D.E. 6-3 at pp. 87-88).

The rheumatoid arthritis causes her to have dry eyes and swelling in her eyes. She sees an ophthalmologist who inserted plugs in her tear ducts and prescribed eye drops,

but she still has bad days.  On a bad day she cannot open her left eye and it sometimes takes hours before it fully opens.  She also occasionally has blurry vision.  When she has a lot of pain or a flare-up her left eyelid will sometimes droop (Tr. 85-86; D.E. 6-3 at pp. 86-87).

Plaintiff also has fibromyalgia which causes her to feel like she's bruised all over. It hurts to be touched (Tr. 85; D.E. 6-3 at p. 86).  She also has been diagnosed with interstitial cystitis which causes her to have frequent urinary tract infections and to leak urine when she coughs, sneezes, or laughs too hard.  She received a treatment where she wore a catheter for six weeks which helped for a while, but she is starting to have urinary tract infections again (Tr. 88; D.E. 6-3 at p. 89).

Plaintiff stated she could sit for ten or fifteen minutes at a time  and could lift less than five pounds.  She brought a large purse to the hearing that weighed more than five pounds.  Plaintiff estimated it weighed eight pounds and the ALJ stated he thought it weighed ten or fifteen pounds (Tr. 75-77; D.E. 6-3 at pp. 76-78).  Plaintiff is no longer able to walk for exercise because her extremities begin to swell immediately.  She has used a cane before.  She can stand for ten or fifteen minutes at a time.  She did not have a driver's license but had driven three weeks previously to a store to buy Ibuprofen.  Her daughter drove her to doctor appointments and to the hearing (Tr. 77-79; D.E. 78-80).

During the day Plaintiff gets up at 6:30 to take medication and then lies back down with a heating pad.  It generally takes her a few hours to get up and moving.  She will make something to eat and then sit on the sofa.  She sometimes does laundry, but she usually has to lie down and elevate her legs.  By the end of the day her legs are extremely

swollen.  She does not take anything for the swelling because she cannot afford to see a doctor about it (Tr. 79-80; D.E. 6-3 at pp. 80-81).

Her daughter visits and sometimes stays all night.  She sees one grandson often and one granddaughter periodically.  She does nothing for entertainment except sit outside.  If she feels good, she will try to walk about ten minutes for exercise, but she will be in pain for two or three days afterward (Tr. 80-81; D.E. 81-82).

Pain makes it difficult for Plaintiff to concentrate because it is distracting and upsetting.  She also gets angry because she cannot do what she used to do.  Before becoming sick she was active and was able to work, exercise, and carry her grandchildren.  She is angry that she can no longer work and is tired of being in bed all the time (Tr. 88-89; D.E. 6-3 at pp. 89-90).  She often has to stop what she is doing and lie down because of intense pain in her back and neck.  It feels like her head is too heavy to hold up.  She puts the heating pad on her back and elevates her legs (Tr. 90; D.E. 91).

The vocational expert (VE) testified that Plaintiff's past work experience as a bank teller is considered light work and had an SVP of 5.[4]  The  administrative  law  judge (ALJ) described a hypothetical person who was a younger individual with a high school education.  She could do sedentary work, lifting ten pounds occasionally and five pounds frequently.  She could stand and walk four out of eight hours in a day, sit for six out of eight hours, and had an unlimited ability to push and pull, with the exception of being

---

[4] "SVP" stands for Specific Vocational Preparation, which is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  An SVP of 5 is "Over 6 months and up to and including 1 year."
http://www.occupationalinfo.org/appendxc_1.html (last viewed August 8, 2017).

only occasionally able to reach overhead. She could frequently use both hands. She could occasionally climb stairs, but never ladders, ropes, or scaffolds and could not run. She could occasionally bend, stoop, crouch, crawl, balance, twist, and squat. She could have occasional exposure to heights, dangerous machinery, uneven surfaces, extreme heat, and cold environments (Tr. 91; D.E. 6-3 at p. 92).

The VE testified that such a person would not be able to return to Plaintiff's past relevant work and had no transferable skills. The person would be able to do jobs at the sedentary, unskilled work level. Examples of such jobs are an order clerk, an address clerk, or a callout operator (Tr. 91-92; D.E. 6-3 at pp. 92-93).

If the person were limited to only occasional bilateral reaching or occasional handling and fingering she would not be able to do the described jobs. Also, if the person were occasionally off task up to one-third of the day, or if she needed to elevate her legs above her waist, she would not be able to do the jobs (Tr. 93; D.E. 6-3 at p. 94).

## LEGAL STANDARDS

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The burden has been described as more than a scintilla, but lower than a preponderance. *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012). "Substantial evidence is more than 'a suspicion of the

existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Marcantel v. Chater*, 58 F.3d 637 at *1 (5th Cir. 1995)(not selected for publication)(citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present. But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). Conflicts of interest are for the Commissioner rather than the courts to decide. *Id.* It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)(citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520. The claimant bears the burden of

proof on the first four steps with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

**DISCUSSION**

In the opinion issued on October 26, 2015, the ALJ found that Plaintiff met the insured status requirements until December 31, 2017 and that she had not engaged in substantial gainful activity during the period from her alleged onset date of January 1, 2012. He further found that she had the following severe impairments: rheumatoid arthritis, disc disease of the cervical spine, and fibromyalgia. The ALJ found that Plaintiff's interstitial cystitis, hypertension, headaches, and depression were not severe. The ALJ further found that none of Plaintiff's impairments met or medically equaled a listed impairment.

The ALJ next determined that Plaintiff had the residual functional capacity (RFC) to perform sedentary work except that she could only occasionally lift and carry ten pounds and frequently lift and carry five pounds; she could stand and walk at least four hours in an eight-hour workday, sit for about six hours, occasionally bend, stoop, crouch, crawl, balance, twist, and squat; she could never run, climb ladders, ropes, or scaffolds; she could have occasional exposure to heights, dangerous machinery, uneven surfaces, and extremes of heat and cold. The ALJ further determined that Plaintiff had gross and fine dexterity and an unlimited ability to push and pull with the exception of only occasional overhead reaching and frequent bilateral hand use. She has no mental impairment. The ALJ next found that Plaintiff could not perform her past relevant work, but that jobs exist for her in significant numbers in the national economy that she can

perform. Examples of jobs listed by the ALJ were an order clerk, an address clerk and a call-out operator (Tr. 35-47; D.E. 6-3 at pp. 36-48).

Plaintiff objects to these findings and argues that the ALJ failed to properly weigh the medical opinion evidence and failed to properly credit Plaintiff's testimony regarding pain and the extent of her impairments. Defendant counters that the ALJ decision is supported by substantial evidence.

### A. Opinion Evidence From Treating Physicians

Plaintiff argues that the ALJ failed to properly weigh the opinion of her treating physician and gave too much weight to the opinions of non-treating medical examiners. Under the regulations, the Commissioner is supposed to give more weight to opinions from treating sources because they are more likely to be the medical professionals most able to provide a detailed, longitudinal picture of a plaintiff's impairments and might bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. 20 C.F.R. § 404.1527(c)(2). In addition, "'[t]he opinion of a specialist generally is accorded greater weight than that of a non-specialist.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000)(quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)(*overruled on other grounds by Sims v. Apfel*, 530 U.S. 103 (2000)).

If the treating physician's opinion on the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the

Commissioner is supposed to give it controlling weight. If he does not give it controlling weight, he is supposed to look at the length, nature, and extent of the treating relationship, the frequency of examination, the support provided by other evidence, the consistency of the opinion with the record as a whole, and the specialization of the treating physician. 20 C.F.R. § 404.1527(c)(2).

The ALJ can decrease reliance on treating physician testimony for good cause, which includes statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by evidence. *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995)(citations omitted). However, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating physician, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's view under the criteria set forth in 20 C.F.R. § 404.1527(d)(2).[5] *Newton*, 209 F.3d at 453(emphasis in original).

In this case, the Dr. Pop-Moody is a board certified rheumatologist and has been treating Plaintiff since 2009 (Tr. 596; D.E. 6-12 atp. 47). The ALJ noted that in August 2014 Dr. Pop-Moody completed a report indicating that Plaintiff has rheumatoid arthritis associated with moderate to severe joint pain, swelling and stiffness, and limited range of motion in her shoulders, hips, and knees. In Dr. Pop-Moody's opinion, Plaintiff could not push, pull, or lift; could not stand for any length of time or walk long distances; and could not stand, walk, or sit for more than thirty minutes without a break or a change in

---

[5] Currently located at 20 C.F.R. § 404.1527(c)(2).

position. The doctor also found that Plaintiff cannot push, pull, or lift and has moderate limitations[6] in her ability to reach, perform fine manipulations, and grasp, turn, and twist objects. In addition, Dr. Pop-Moody indicated that Plaintiff was likely to be absent from work in excess of three times per month as a result of her impairment or treatment (Tr. 44-45; D.E. 6-3 at pp. 45-46).

If Dr. Pop-Moody's opinion were given controlling weight, it would change the RFC assigned by the ALJ and also the hypothetical question presented to the VE. However, the ALJ gave "very little weight" to Dr. Pop-Moody's opinion regarding the nature and severity of Plaintiff's impairments stating that the opinion was inconsistent with the longitudinal record as well as the doctor's treatment records. In particular, the ALJ noted the following: (1) During examinations, Dr. Pop-Moody noted no neurological deficits or abnormalities of gait or coordination; (2) Although Dr. Pop-Moody's examinations revealed persistent tenderness in the joints of Plaintiff's hands, there were no reports of any associated swelling or loss of motion; (3) Although Dr. Pop-Moody stated that Plaintiff has been limited as set forth in her assessment since 2009, Plaintiff engaged in substantial gainful activity until 2011 (Tr. 45; D.E. 6-3 at pp. 46).

A review of the record shows that the ALJ's conclusions are not supported by substantial evidence. Regarding neurological deficits, the record shows that Plaintiff had mild neurological deficits before her alleged onset date (Tr. 315-317; D.E. 6-9 at pp. 4-6) and has not undergone further neurological testing. However, even in the absence of

---

[6] A moderate limitation means an activity is significantly limited but not precluded (Tr. 598; D.E. 6-12 at p. 49).

severe neurological deficits, it is unclear why the ALJ focused on a lack of neurological deficits to discount Dr. Pop-Moody's opinion. According to the regulations, a neurological deficit is considered one of several extra-articular features of inflammatory arthritis. *See* 20 C.F.R. Pt. 404 Subpt. P, App. 1, listing 14.09(e)(iii). Others include musculoskeletal issues, which are documented in the record (Tr. 259, 261, 638; D.E. 6-8 at pp. 18, 20; D.E. 6-12 at p. 89), ophthalmologic issues such as keratoconjunctivitis sicca and uveitis, also reported by Plaintiff (Tr. 475, 514, 517-518, 520, 522; D.E. 6-11 at pp. 27, 66, 69-71, 72, 74), and cardiovascular palpitations, with which Plaintiff was diagnosed in April 2012 (Tr. 276-277; D.E. 6-8 at pp. 35-36).

An ALJ must consider all the evidence in the record and cannot pick and choose only the evidence that supports his decision. *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). Here, the ALJ focused on the lack of particular evidence in the record, but did not discuss the evidence present in the record. Accordingly, given the evidence in the record showing extra-articular features, the fact that Dr. Pop-Moody did not find serious neurological deficits does not support the ALJ's decision that her opinion is entitled to very little weight.

The same is true of the lack of a finding by Dr. Pop-Moody that Plaintiff did not have abnormalities of gait or coordination. There is no indication in the record that Dr. Pop-Moody made that type of assessment for Plaintiff, but on examination she found that Plaintiff had a reduced range of motion in her lower extremities. In visits Plaintiff made to Dr. Pop-Moody from December 2012 through July 2014, it was noted that Plaintiff had diminished range of motion in her hips and knees and that they were tender and

painful (Tr. 339, 342, 345, 347, 353, 355, 641, 611; D.E. 6-10 at pp. 4, 7, 10, 13, 18, 20; D.E. 16-12 at pp. 92, 62). In addition, when Plaintiff was assessed for physical therapy in May 2011 it was noted that she walked with stiffness and guarding (Tr. 266; D.E. 6-8 at p. 25). Given the consistent assessments by Dr. Pop-Moody that Plaintiff had pain and a reduced range of motion in her hips and knees, the fact that Dr. Pop-Moody did not note that Plaintiff had abnormalities of gait or coordination does not support a conclusion that her assessment is entitled to very little weight.

The ALJ also declined to credit Dr. Pop-Moody's findings that Plaintiff cannot push, pull, or lift and has moderate limitations in her ability to reach and grasp and handle objects because there were no reports of swelling or loss of motion in her hands. While this is true, there are many descriptions of Plaintiff having tenderness in her hands and both elbows and a painful deformity at the medial aspect of her right elbow (Tr. 339, 345, 348, 350, 353, 577, 585, 588, 614, 641, 643; D.E. 6-10 at pp. 4, 10, 13, 15, 18; D.E. 6-12 at pp. 28, 36, 39, 65, 92, 94). In addition, at almost all of Plaintiff's visits to Dr. Pop-Moody it was noted that Plaintiff had pain with a full range of motion in her right shoulder. Beginning in June 2012, Dr. Pop-Moody reported that Plaintiff had a limited range of motion in both shoulders with pain (Tr. 358, 355, 353; D.E. 6-10 at pp. 23, 20, 18). In December 2012, examination showed that Plaintiff had limited, painful range of motion in both shoulders and could not raise her right arm above her head (Tr. 350; D.E. 6-10 at p. 15). In April 2013 Plaintiff had abduction to 160 degrees and diminished internal rotation of both shoulders (Tr. 345; D.E. 6-10 at pp. 10).

Hip, knee, shoulder, and elbow limitations observed by Dr. Pop-Moody over the seven years she treated Plaintiff are consistent with her opinion that Plaintiff is unable to push, pull, or lift and that she cannot stand, walk, or sit for more than thirty minutes without changing positions or taking a break. The doctor's assessment also supports her opinion that Plaintiff is moderately limited in the use of her arms and hands. Nevertheless, the ALJ gave Dr. Pop-Moody's opinions very little weight while giving some weight to assessments completed by two non-examining state agency physicians who never saw plaintiff but concluded that she can do light work with additional limitations.

Dr. Pop-Moody's medical opinion is supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in the case. Thus, it is entitled to controlling weight unless the ALJ cites to evidence from a treating or examining physician to controvert Dr. Pop-Moody's opinion. 20 C.F.R. § 404.1527(c)(2). Because the ALJ did not give controlling weight to the treating physician's opinion and did not cite to a treating or examining physician to controvert the opinion, under *Newton*, he must perform a detailed analysis of the treating physician's opinion, including the factors set out in 20 C.F.R. § 404.1527(c)(2). With the exception of discussing the consistency of the evidence, the ALJ's decision did not comport with the holding in *Newton* or the regulations.

The ALJ's third reason for discounting the doctor's opinion, that she stated that Plaintiff has been limited as set forth in her assessment since 2009 although Plaintiff engaged in substantial gainful activity until 2011, is a misreading of the statement. Dr.

Pop-Moody stated that she had been treating Plaintiff for rheumatoid arthritis since September 25, 2009, but did not say Plaintiff had been experiencing all the described limitations since that time (*Compare* Tr. 45; D.E. 6-3 at pp. 46 with Tr. 596; D.E. 6-12 at p. 47).

For all the reasons stated above, it is recommended that the Commissioner's opinion be vacated because the ALJ erred when he gave "very little weight" to the treating physician's opinion on Plaintiff's impairments. It is further recommended that the case be remanded so that the ALJ can assess the opinion of the treating physician in a way that comports with the relevant statutes and regulations.

### B. Plaintiff's Credibility

Plaintiff also complains that the ALJ failed to consider her subjective complaints. Social Security Ruling[7] 96-7P, 1996 WL 374186 (S.S.A.)[8] addresses evaluation of symptoms in disability claims and in particular, the credibility of an individual's statements. According to the ruling, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms. The ALJ must next evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's abilities to do basic

---

[7] Social Security Rulings are not binding on the court, but may be consulted when the statute at issue provides little guidance. The Fifth Circuit has frequently relied upon the rulings in evaluating ALJ decisions. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001)(citations omitted).

[8] SSR 96-7P was rescinded and replaced by SSR 16-3P, 2016 WL1119029 (S.S.A.), effective March 16, 2016. At the time the ALJ made his decision, SSR 96-7P was in effect and his decision is analyzed in terms of the ruling in effect at that time.

work activities. If the individual's statements regarding the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must consider the entire case record, including medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians, psychologists, or other persons about the symptoms and how they affect the individual, and any other relevant evidence.

In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by objective medical evidence, SSR 96-7P sets out the following factors, outlined in 20 C.F.R. 404.1529(c), which the ALJ should consider: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms, such as lying flat, standing for 15 to 20 minutes every hour or sleeping on a board; (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Finally, the Ruling sets forth the standard for making credibility determinations:

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the

determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statement and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim and in order to ensure a well-reasoned determination or decision.

SSR 96-7P, 1996 WL 374186 at *4.

In this case, the ALJ discounted Plaintiff's testimony regarding the extent of her impairments in part because she had not been hospitalized or sought recurrent emergency treatment. However, Plaintiff received continuous, ongoing treatment for rheumatoid arthritis and fibromyalgia. The lack of hospitalizations or recurrent emergency treatment is not substantial evidence on which to base a finding that Plaintiff's testimony is not credible.

The ALJ also asserts that records submitted by treating physicians fail to document any objective clinical or diagnostic finding that would preclude performance of sedentary work. As discussed in SSR 96-7P, an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by objective medical evidence. Thus, the lack of objective findings is not substantial evidence that Plaintiff's testimony is not credible. Moreover, there are objective clinical findings, such as a positive ANA test and cervical disc bulges and disc herniation shown by imaging, that support Plaintiff's complaints of pain and swelling in her extremities.

The ALJ also did not credit Plaintiff's testimony in part because she was not always compliant with her medication regimen for rheumatoid arthritis. According to SSR 96-7P, a plaintiff's statements may be found not credible if the level of treatment is inconsistent with the level of complaints, or if records show that the plaintiff is not following the treatment prescribed and there is no good reason for the failure. However, the ALJ must consider explanations from the plaintiff explaining the failure to seek prescribed treatment because the explanations may provide insight into the plaintiff's credibility. One of the factors the ALJ must consider is whether the plaintiff can afford treatment or has access to free or low-cost medical services. *Id.*, 1996 WL 374186 at *8.

Plaintiff testified at the hearing and consistently reported to Dr. Pop-Moody that she could not always afford to buy all of the prescribed medications. Plaintiff stated that she was trying to enroll in an indigent program where the cost of her medications would be covered, but went to the wrong county and then became bedridden for three days with pain (Tr. 63; D.E. 6-3 at p. 64). Plaintiff also told Dr. Pop-Moody in 2014 and 2015 that Xeljanz was helpful but she could not afford it (Tr. 613, 637, 640; D.E. 6-12 at pp. 64, 88, 91). Plaintiff was not taking Xeljanz at the time of the hearing because she could not afford it. Instead, she was taking five or six Ibuprofen at a time for pain. However, she had applied for a program to receive Xeljanz for free but had not yet heard whether she had been accepted (Tr. 68-69; D.E. 6-3 at pp. 69-70).

The ALJ stated that Plaintiff's inability to afford medications or lack of resources was not a valid reason not to take prescribed medication or seek out treatment at an emergency room or indigent care clinic, which he did not see had been done in Plaintiff's

case (Tr. 44; D.E. 6-3 at p. 45). However, given Plaintiff's consistent, uncontested statements regarding her inability to afford all of her medications and that she was seeking assistance to pay for her medications, the ALJ erred when he found that her indigence was not a valid reason for her to stop taking the medication.

The ALJ also discounted Plaintiff's assertion that she had experienced ongoing and disabling symptoms since January 1, 2012 because she received no treatment from December 2011 to February 2012, a period of roughly two months. The record shows that Plaintiff saw Dr. Pop-Moody about every other month beginning at least as early as 2010. While Plaintiff did not see Dr. Pop-Moody from December 2011 to February 2012, the finding that she received no treatment is not supported by the record. During that time frame, Plaintiff was taking nine medications, including two to treat her rheumatoid arthritis, and others prescribed for tension headaches, neuropathy, edema, high blood pressure, and pain (Tr. 481-482; D.E. 6-11 at pp. 33-34). Given Plaintiff's regular doctor visits and medication regimen, the fact that she did not see a doctor until one month after her alleged onset date is not substantial evidence that her complaints are not credible.

The ALJ also noted that at times Plaintiff described her symptoms as mild or minimal and that she had readily acknowledged that she worked part time after her alleged onset date. While the ALJ is entitled to rely on that type of evidence in making his credibility determination, he did not address Plaintiff's assertions in terms of the longitudinal record and the fact that her symptoms are more pronounced at some times than at others, which is consistent with her diagnoses of rheumatoid arthritis and

fibromyalgia. It is recommended that the decision of the Commissioner be vacated and that this case be remanded so that the ALJ may make a credibility determination of Plaintiff's subjective complaints that comports with the relevant regulations and case law.

### C. Residual Functional Capacity

A claimant's RFC is an assessment of her ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, which means eight hours per day, five day per week, or an equivalent work schedule. *See* SSR 96-8p at *1, 1996 WL 374184 (S.S.A.). In assessing RFC, the adjudicator must consider all of an individual's impairments, including those that are "not severe." *Id.* at *5.

The ALJ determined that Plaintiff can do sedentary work with additional limitations as described above.

The ALJ's finding on RFC conflicts with Dr. Pop-Moody's opinion on Plaintiff's ability to stand, walk, sit, push, pull, reach, and handle objects. Had the ALJ given Dr. Pop-Moody's opinion greater weight, it would have changed his RFC finding for Plaintiff and the hypothetical question he posed to the VE. In particular, it would have changed the RFC in terms of how long Plaintiff can stand, walk, and sit during the day and his assumption that she can use both hands frequently. If the District Court adopts the recommendation to remand this case for further proceedings, the ALJ also should reconsider the RFC assessment.

### <u>RECOMMENDATION</u>

Based on the foregoing, it is respectfully recommended that Plaintiff's motion to reverse the determination of the Commissioner and remand her case for additional

administrative proceedings (D.E. 8, 9) be GRANTED. The Commissioner's determination that plaintiff is not disabled is not supported by substantial evidence and should be VACATED. It is further recommended that Plaintiff's case be remanded to the Social Security Administration so that a proper assessment can be made of the treating physician's opinion, Plaintiff's subjective complaints, and Plaintiff's RFC to do work. This recommendation for remand is made pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Respectfully submitted this 15th day of August, 2017.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(*en banc*).